Good morning. May it please the Court, Christine Monta for the appellant, Matthew Locke. I'd like to reserve three minutes for rebuttal, please. Across more than a dozen cases, this Court has established a clear and particularized Fourth Amendment principle, that it is objectively unreasonable for the police to use anything more than de minimis force against somebody who is not suspected of a serious or violent crime, not fleeing or actively resisting arrest, and not posing any safety threat. In Mitchell v. Kirchmeier, another case involving a peaceful protester, this Court made clear that the right to be free from de minimis police force in these circumstances not only is clearly established, but is sufficiently particularized to put an officer on notice for qualified immunity purposes, regardless of the particular method of force the officer employs. And just last month in Pomakea v. Morton County, another peaceful protester case that we submitted via our 28J letter, this Court again emphasized that that right is clearly established and particularized, citing Mitchell and the long line of cases that it collected. As in Mitchell and Pomakea, we are here before this Court on a motion to dismiss. And as in those cases, defendants are not entitled to qualified immunity at this early stage of the proceedings. Because Mr. Locke's complaint ---- Doesn't your argument, though, sort of run headlong into our cases that say you can use sufficient force that's necessary to effect an arrest? No, Your Honor. I don't think so, because the line of cases that we're relying on essentially make clear that when the circumstances that Graham identified that could potentially give rise to the need for force, when none of those circumstances is present, then an officer cannot use anything more than de minimis force in effectuating an arrest. And in this case, what is alleged is that defendants used not only more than de minimis force, but very significant and injury-causing force. And I would note, Your Honors, that in this particular case, no force was necessary to effectuate the arrest at all, because as alleged in the complaint, defendants had an alternative means to remove these protesters from ---- But how do we know that the alternative means didn't involve force? Well, because as alleged, Your Honor, the alternative means was an extraction team that would cut the device, and we know that the extraction team was able to remove Mr. Locke without incident. Again, we're at the motion-to-dismiss stage. And so the Court is bound by what's alleged in the complaint and the reasonable inferences from that. And we know that the cut team did not cause Mr. Locke any harm or injury whatsoever, whereas ---- Is your understanding that these pain-compliance techniques of the sort that we're talking about here are never lawfully used by police when there's no active resistance? I mean, what is your understanding of the state of our clearly established law here? Or is it the three factors that really drive that analysis, or the multiple factors of active versus passive resistance? Yes, Your Honor. I mean, we're not making any sort of categorical argument about, you know, that this Court would need to prohibit these techniques outright. Our argument is that under this Court's clearly established law and this line of cases that Mitchell and Palmaquia recognized, when none of the Graham factors is present, so when there's no active resistance at all, right, no struggling or fighting or anything like that, when the individual is not attempting to flee, and when there's no safety threat to the officers or those around him, and when there's no suspicion that the individual has committed a serious or violent crime, when none of those factors is present, then the officers can't use more than de minimis force. And here, you know, again, the way that the officers employed these techniques was far more than de minimis, you know, repeatedly and systematically pressing their hands into the nerves in Mr. Locke's face and skull. He alleged that the very purpose of these techniques was to cause excruciating pain and that the pain rose to the level of torture. He alleged in the incorporated video that at one point one of the officers was pushing so hard into his nasal cavity that he began to lose oxygen. And, of course, we know that the result of this force was serious injury. It paralyzed half his face and it caused him to suffer tinnitus, which was, incidentally, one of the injuries in Graham v. Connor itself. So our argument is simply that at this early stage of the proceedings, Mr. Locke has alleged precisely all of the circumstances that this Court has held warrant no more than de minimis force, and that, as alleged, the force defendants used was certainly much more than de minimis on the face of the complaint. As the newcomer here to the Mitchell case, let me ask you this. This is a matter of dismissal of the pleadings. Tell me what paragraph tells me it's clearly more than de minimis. Do you know which paragraph of your complaint or where that is? I have the complaint in front of me. Sure. Your Honor, the complaint doesn't use the term de minimis. No, no, no. Yeah. Right. That's a conclusion. I get it. Right. But tell me what says not de minimis. Okay. So I think a few things. So on page 6 of the joint appendix, so from paragraphs 13 to 19, is the description of the techniques that defendants employed. Right? So 6 to 7 applications of pressure to these nerves on Mr. Locke's face and skull. The incorporated complaint that was incorporated at paragraph, excuse me, the incorporated video that was incorporated at paragraph 2 of the complaint, there's descriptions of these techniques that make clear that they were not sort of momentary or fleeting touchings. Right? They were sustained for some period of time, anywhere between, you know, 3 and I think 5 or 6 minutes of this kind of pressure. Is the 3 or 5, 6 minutes alleged? No, Your Honor. You have to look at the video. I'm sorry? You have to look at the video to see the 3 to 6 minutes, right? Right. So what one of the protesters described in the video was that the technique was 30 to 45 seconds. And Mr. Locke alleged 6 to 7 of these techniques. So if you do the math, it's a minimum of 3 minutes. And of course, you know, the allegation is the complaint repeatedly describes these techniques as being tantamount to torture. That's paragraph 1 of the complaint, paragraph 15, paragraph 17, paragraph 19. The complaint alleges that the very purpose of these techniques was to cause excruciating pain. And again, in the incorporated video, there are multiple descriptions of the sort of way that these protesters experienced this pain. I know it's not this case, but if the officers, the deputy and the sheriff had arrived and done this once, in other words, the extraction team is on the way and we're going to try to let them off, right? Let them go. So we're going to try to get these guys released. I understand that's not your case, but what I'm trying to understand is your understanding of our clearly established law. Would that one application be a violation in your understanding of our case law? Obviously, that's a much closer case. It's not what we have here. I'm just trying to understand what we've said about the use of these pain compliance techniques generally. And in that case, as I've described it, we don't have the accident circumstances or anything like that, but is that an unconstitutional use of force? Your Honor, I think that, again, would just turn on. If, as alleged, none of these circumstances, right, so the same circumstances, no, no. Gram factors aren't present. Right. Gram factors aren't present. If they're not present, you're suggesting that would be a constitutional violation. I think it would depend on, you know, the extent of the force. And if it caused serious injury. That's where I get stuck on the clearly established, because it seems to depend a lot here. And I understand that your complaint, we need to judge on the face of your complaint, and your argument is it's far enough over there. But, you know, if the gram factors aren't present and it still depends, that's kind of what I'm stuck on. Well, no, Your Honor. I mean, I guess if in the hypothetical that you're suggesting, even one application of this use of force caused a significant injury, I think that under Chambers v. Pennycook, the degree of injury is relevant to assessing whether the use of force was, you know, excessive, the extent and the nature of the use of force. And so at this early stage, I think, yes, probably that case should proceed past a motion to dismiss and then allow discovery on, you know, what exactly they did, what the circumstances were, what the, you know, the causal relation between the injury, et cetera. But, again, that's a much closer case than the circumstances here. Doesn't the pleading, though, sort of indicate an increasing use of force? I'm sorry? Doesn't the pleading show an increasing use of force, starting low and gradually increasing in whatever it is, pain to him or the use of force? It certainly indicates multiple repeated uses of force. I don't know that it could be characterized as, I mean, probably increasing, but even the very first use of force that's alleged was pushing one's, excuse me, Chief Deputy Parks' hands into the nerve behind his ear for the purpose of causing excruciating pain. So even the very first technique that was used. Let me ask you this. Could Mr. Locke have stopped this at any time by releasing himself? I think, Your Honor, the complaint suggests that he could have, because it says, you know, he didn't release himself in response to this torture. Does that matter? Does that matter? No, Your Honor. It doesn't matter, because the question is the objective reasonableness of what the officers did here. And as alleged, the officers arrived on the scene, saw peaceful protesters, and then immediately, you know, went straight to essentially torturing them using significant force that ultimately resulted in serious injury. But if he can stop it at any time by complying, doesn't that seem to matter? It doesn't matter under this Court's case law. It doesn't matter under the Graham factors, Your Honor. I mean, the Graham factors talk about active resistance. The Graham factors, you know, I think, and the way that this Court has applied the Graham factors. Well, and that brings me back to where I started. You know, we have cases that say you can do enough force to affect an arrest. Your Honor, where this Court has upheld uses of force against a passively resistant suspect, it's been in cases where some other Graham factor is present. Generally speaking, there's some sort of threat. Okay. What's your closest case? I know you're into your rebuttal now, but just tell me what you think the very closest case is. For the purposes of our court. Yeah. Yeah. Send me to your case. Your Honor, all of the cases that this Court recognized in Mitchell. Right? So all of those cases combined.  Okay. Yes. Okay. Mitchell.  Okay. Thank you. All of the cases that Mitchell recognized. Okay. Thank you. Okay. I'll reserve the rest of my time for rebuttal. Very well. Thank you. Thank you. May it please the Court, Counsel. My name is Stephanie Engelkar. I represent the appellees here. The Court should affirm the judgment of the District Court. I am going to jump into a few things that the Court has addressed here. But the overarching issue here is that when there's no case in this circuit or robust persuasive authority in the other circuits to put these officers on notice that the use of pressure point pain compliance techniques on a community is more than de minimis force, they're entitled to qualified immunity in the District Court. Counsel, do you think our cases go technique by technique or go on these basic principles that you're well aware of? Many are Minnesota cases, Minnesota federal cases. Do you think it goes on the basic, you know, the four or five major factors that we've identified in the Taser case and on the cell phone case and the other cases? Your Honor, so yes and no. And I know that's a very lawyer answer. With the Taser, that's a unique weapons platform and I don't think there's Well, wait. We didn't act like it was unique in one of those first cases where the woman's on the cell phone with a 9-11 just sitting there talking. I think. Correct. And Brown versus City of Golden Valley. I can't remember the names. I was on a couple of them. Yes. But. So with regard to. Do you think we go by the general factors or do you think we go technique by technique? The overarching theme here is it needs to give fair notice to the officer. So I would categorize techniques, if I can say that, that pain compliance techniques are in a category of their own separate from bean bag rounds that were the issue in the cell. How are they so much different from a Taser, Counsel? It inflicts a pain immediately. You're sitting there on the cell phone, you get a Taser in you. That's a good point, Your Honor. A Taser is an electronic control device that does use pain as the primary compliance method. What's different is that that's a device. We're talking about the use of an officer's hands and they train. There was an officer hand on the Taser, Counsel. Go ahead. They train separately on those platforms and then this court and other precedent gives notice to these officers of whether they can be using such techniques. What is important here is that there's nothing in the Eighth Circuit to put them on notice about use of pressure point tactics and it's not just the force used itself. You look at the other gram factors here. We're looking at a passively resisting arrestee. He is under arrest. This is no peaceful protest. This is trespassing. It can be both, right? Many arrests come out of peaceful protests, right? That's correct, Your Honor, but there's a breach of peace here. It was a felony that he was committing in trespassing on this public utility project, interfering with the work, connecting himself to an excavator, which is expensive equipment. This stuff's not in the complaint, right? Some of the things you're just telling us right now, they're certainly not in the complaint. It is in the complaint, Your Honor. A felony and stuff like that? The felony is not in the complaint. The felony is part of the public record that was in the district court record. I believe it's, I'm going off memory, I think it's 15-1 in the docket. His complaint and then the conviction is 15-2, but what's important here Is even the trespassing in here? Yeah, there were trespassings here. Proceed.  Yes, Your Honor, and it was the Enbridge pipeline project. Mr. Locke admits that he was not letting go. He was remaining in the sleeping dragon, connected, and as Justice Kennedy recognized in Bray v. Alexandria Women's Health Clinic, the wholesale commission of common state law crimes creates dangers that are far from ordinary, even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of the state to maintain order and preserve the rights of its citizens. And in this organized manner of connecting themselves to expensive excavators to block work from being performed is no different than the Ninth Circuit case in Forrester, which upheld the use of pressure point tactics under the Graham factors. So even in other circuits, which arguably might be more likely to find violations under Graham, there's no notice to these officers that they can't use the pressure point tactics. Now, if this circuit doesn't like that, under the Qualified Immunity Case Law and the Supreme Court precedent, you have the authority to now draw a line and say, we don't like this, we find that that's a violation under the Fourth Amendment. But as of the time of this protest in 2021, it was not clearly established that the officers could not use those pressure point techniques to attempt to persuade Locke to release himself from the sleeping dragon. Now, Locke has focused on the injury that was alleged here. Counsel, the date in the Mitchell case is 2016, right? And we held the law was clearly established in 2016? Yes, Your Honor. So what do you think was clearly established in 2016? Which will also, of course, be established when this happened. Based on Mitchell, that an officer cannot use more than de minimis force to affect the arrest. So the issue here would be that the use of those pressure point pain compliance tactics was not more than de minimis force here. Well, how about the use of six in a row? Five or six? I would say still, no. There's nothing clearly showing. It could be 10, it could be 20. There's nothing showing that the use of such techniques. Do you really believe that, Counsel? 10, 20, 50? They have a long time. Suppose there's one of these in the state, we have some poor states, and they've only got one of these extractions. Do you really think it could be an infinite number of these kind of items? I wouldn't say infinite, but if you don't change any other facts in this case, I would say that there's still nothing clearly putting them on notice under these facts. And do you think there were five or six techniques used here? How do you count them? What was alleged here, I believe that there's at least six alleged that Parkes uses left ear, right ear, nasal, and then the sheriff attempts the same thing, none of which was effective to obtain Mr. Locke's agreement to release himself from the sleeping dragon. Now, the focus on the injury, it's certainly a relevant factor for the court to look at. That didn't change with Chambers versus Pennycook. But what's important here is the resistance. So the injury standing alone is not what is dispositive, and it's insufficient to show that the force was unreasonable. And when we're looking at the other factors, Locke had the ability to release himself. He was resisting his arrest. This is a felony trespass. And what's important here, too, is the other interests here of this is the property interest. This is a challenge to the breach of peace and increased conflict and confrontation with law enforcement placed right in the middle. And this was not gratuitous force because something needed to be done to release him. Something was done. The extraction team was on its way. There's actually nothing in the complaint that states that the officers knew that they were on the way or when they would be getting there. So there's also nothing indicating or putting them on notice that they can't make some effort to see. I mean, what if he did release himself? And then that's it. And maybe they're just... Well, I mean, that works with my kind of hypothetical about if it was done once. And the question here is it was pled, it was done multiple times, and it could be argued or inferred from the complaint that it wasn't going to be effective. And at what point does it become gratuitous use or at least not de minimis force? The complaint doesn't really make it clear because the complaint lays out each of the uses of force and then after that says that Locke was beginning to experience symptoms. So he doesn't lay out whose specific use of force caused that issue. I would point out too... Well, counsel, the last one they say right beside the face no longer working. I'm paraphrasing, but that's what it says. So don't you think paragraph 20 does that and some of the others too, but 20 particularly? And what I'm saying is that he doesn't tie it to, okay, was it the left ear? Was it the right ear? Was it the nasal from Parks? Or was it from the use of force by the sheriff? He says right side of the face. We're looking at the same thing, right? Yes. Yes. Yeah. And what I don't know... And we do intendments of the complaint in favorable to the plaintiff. But proceed with your argument. Yeah. And what I don't know from reading that paragraph 20 is, is he then tying that to Parks' pain compliance on the right ear? Is he tying it to the nasal? Is he tying it to the left ear? I'm not a medical expert that it could somehow transfer. I have my own thoughts on the Bell's palsy issue, but we're at a Rule 12 and there's nothing in the record to address that. So it's not tied to that. What is important too that I wanted to point out with regard to that is that under Wilson v. Northcutt, it's specific to the officer. So is he tying that to Parks' use of force? Is he tying that to Ox's use of force? And the district court didn't go through the analysis of whether there was, in fact, a constitutional violation. It instead focused on was it clearly established? And I pointed to case law outside of this circuit that certainly supports the use of the tactics, but also within this circuit. This court had asked, I believe Judge Grunder asked, about using force to effect an arrest. And under this circuit's own case law in Cravener, Ellers, Cohorst, and Wordish, it supports that use of force to effect an arrest. And in Wordish that also recognized that force may be used to effect the arrest of a passively resisting arrestee. If we were to decide the way you're suggesting that it's not clearly established, and if we were to conclude that the sheriff is the policymaker, does the claim against the sheriff and the county still go on? No, Your Honor. Under Smith v. Boyd, the district court did not err by dismissing the official capacity claim. The appellees moved for dismissal of the entire complaint. And when we look at the complaint, the only reference to anything about official capacity is in the caption. That's it. There's no, there are no facts alleged about the sheriff's ability as policymaker and his authority. And that is something that while sheriff authority is addressed under Minnesota state law, there's nothing else pled in the complaint to pursue the PEMBAR liability theory. So this court should also affirm that basis of the dismissal as well as the grant of official immunity. Did the district court have before it all the information, I'll call it, about the power of sheriffs in Minnesota and many other states? No, Your Honor. That was, that just wasn't even an issue that was briefed or argued.  Right, Your Honor. Correct. Yes. I was assuming that. Yes. Otherwise, if there are no other questions, we would ask that this court affirm the judgment of the district court. Thank you. Very well. Thank you. Ms. Monta, rebuttal. Yes, thank you. I'd like to start where you started, Judge Benton, which is defendant's technique-by-technique or weapon-by-weapon approach. This court has rejected that sort of specificity approach as prohibitively difficult, and we cited numerous cases from other courts. Which case of our court says that clearly? We cited Banks, Your Honor, Banks v. I believe Howard. And again, numerous other courts have explained why, as the Fifth Circuit put it in Newman v. Godry, the lawfulness of force does not depend on the precise instrument used to apply it. Here, this court has established, as Mitchell and Palmaquia recognized, a very clear directive to officers. When none of these gram factors is present, as was alleged in this case, you cannot use more than de minimis force. And my opposing counsel recognized that that right was clearly established as of 2016. So the only question here is, was the force alleged more than de minimis? And it absolutely was more than de minimis, as I think we discussed in my opening. Both when you think about what was alleged, they actually did. Again, pushing their body weight. The purpose of these techniques was to cause pain six or seven times, systematically and repeatedly, and, of course, resulted in very serious harm. At this very early stage of the proceedings, Mr. Locke has alleged all of the circumstances that this Court has recognized constitute a Fourth Amendment violation, and the case should be allowed to proceed. And I'd like to point out, Your Honors, defendants have not cited a single case, as I see it, where this Court has upheld a grant of qualified immunity in this context at the 12B6 stage. All of these cases that defendants are relying on have proceeded to summary judgment, development of evidence, if not post-trial, which is the Forrester case that they're relying on in the Ninth Circuit. Your Honor, the only other point I'd like to make is defendants rely on cases like Cravener, Ehlers, Wordish, et cetera. In all of those cases, again, there were other gram factors present. In Ehlers, the individual was actually fleeing the police. In Cravener and Wordish, the individual was posed a danger, was aggressive, et cetera. And so the Court said in those cases, well, the fact that you might characterize his conduct as passively resistant is neither here nor there because there was still a danger to the officers that necessitated the use of force. If there are no further questions, I would respectfully ask this Court to reverse the judgment of the District Court. Thank you.